# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1266 | **DATE** | 12/28/2000 |
| **CASE TITLE** | CEZARY GLEBOCKI vs. CITY OF CHICAGO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  **Defendant's motion (38-1) for summary judgment is granted.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 28 2000 date docketed | |
| ✓ | Docketing to mail notices. | | | 44 |
| ✓ | Mail AO 450 form. | 🚫 | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| DW | courtroom deputy's initials | 00 DEC 28 PM 12:53 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

CEZARY GLEBOCKI,

Plaintiff,

v.

CITY OF CHICAGO,

Defendant.

No. 99 C 1266
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

This is a national origin discrimination suit brought under Title VII. 42 U.S.C. § 2000e-2(a) (employer shall not discriminate because of "race, color, religion, sex, or national origin"). Defendant moves for summary judgment. I will grant the motion if there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). I evaluate the evidence in the light most favorable to plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986).

Cezary Glebocki immigrated to this country from Poland and was a probationary police officer, employed by the City of Chicago, from March 17, 1997 until his termination on March 16, 1998. Upon initial hire, Glebocki was assigned to the Training Academy. Sgt. Joseph Fitzsimmons was the supervisor of the law unit of the Training Division and his responsibilities included supervising recruits and training at the Academy.

**The Naturalization Ceremony**

On March 26, 1997, Glebocki requested a day off to attend his wife's naturalization oath ceremony in April. Through the chain of command, the request went to Glebocki's home room

44

instructor, Officer Flora Suttle. Suttle passed the request on to Fitzsimmons who consulted his superior, Lt. Sam Christian. Christian says he informed Fitzsimmons that routinely the Academy would have recruits delay naturalization ceremonies until they completed their training because the ceremonies were ongoing, regular events. The CPD Training Manual states "trainees will not be excused from daily assignments at the Academy except for urgent situations." Fitzsimmons denied Glebocki's request and told Suttle that the naturalization ceremony was not an urgent situation.

The naturalization ceremony was April 8, 1997. On that day, Glebocki submitted a second request for an absence, this time asking for part of the day off. Fitzsimmons happened to be absent from work, so Suttle and Glebocki sought approval for the request from another supervisor at the Academy. Sgt. Paige approved the request for a partial day off. Glebocki left the Academy between 10:00 and 11:00 a.m. to attend the 12:00 ceremony. Glebocki says the ceremony started two hours late and finished around 3:30 p.m. He called the Academy duty desk and was told not to return to work because it was too late. Glebocki did not return to the Academy that day.

On June 2, 1997, Fitzsimmons learned of Glebocki's absence on April 8, 1997. Fitzsimmons ordered Glebocki to submit a memorandum explaining the absence, and interviewed Suttle and Paige. Fitzsimmons then initiated a complaint to investigate charges against Glebocki and Suttle for disobeying his prior order denying permission to be absent. Officer Draper-Sibley handled the investigation.

During the course of this investigation, Suttle told Draper-Sibley that she believed Fitzsimmons had a personal conflict with Glebocki and that Fitzsimmons had, at one time, told Suttle that Glebocki was "clever and like a crook, not the kind who would take drugs or money from a dope dealer, but that would import stolen cars to Poland." Draper-Sibley initiated charges against

2

Fitzsimmons to investigate the statements he made concerning Glebocki. Fitzsimmons told Draper-Sibley that he believed Glebocki was dishonest, untrustworthy and not suited to be a member of the Department. In his deposition, Fitzsimmons denied saying Glebocki was a crook but acknowledged that he made reference to a news report about a criminal organization exporting stolen luxury cars to Poland. Fitzsimmons says he made the comment in the context of characterizing Glebocki as untrustworthy. Draper-Sibley recommended a two-day suspension for Glebocki, concluded that the allegations against Suttle were unfounded, and did not sustain the allegations against Fitzsimmons.

**The Broken Car Window**

On May 29, 1997, someone broke the window of Glebocki's car in the parking lot of the Salvation Army. On May 30, 1997, Glebocki drove to a car dealership in Bensenville to have the window fixed before work. Roll call at the Academy started at 0750; Glebocki arrived at the dealership before 0700, but they did not let him in to the service department until 0720. At 0730, Glebocki called the Academy to tell them he would be late for work; he was told to call back and speak to Fitzsimmons. At 0745, Glebocki spoke to Fitzsimmons; Fitzsimmons told him to call again when the repairs were almost completed. Glebocki asked the dealership when the repairs would be finished, but they did not know. Glebocki canceled the repairs and called Fitzsimmons at 0845. Fitzsimmons told Glebocki that he would not be admitted to the Academy.

On June 2, 1997, Fitzsimmons ordered Glebocki to submit a memorandum explaining the urgency of going to the Bensenville car dealership, instead of reporting to work. Fitzsimmons then ordered Glebocki to show him the damage to the car. The car was parked in a garage at a private residence. According to Glebocki, Fitzsimmons drove Glebocki to the garage. Fitzsimmons observed the broken window. On June 3, 1997, Fitzsimmons issued a summary punishment action

3

report (SPAR) against Glebocki recommending a two-day suspension for being absent without permission. Glebocki refused to sign the SPAR, and appealed. His punishment was reduced to a written reprimand.

**The Missing City Sticker**

Fitzsimmons noticed that Glebocki's car did not have a City of Chicago sticker. The Police Department training rules require recruits to conform to all city ordinances. Fitzsimmons requested an investigation into whether Glebocki drove his car without a proper sticker. Glebocki believes the sticker was stolen from his car, after the break-in (the sticker was not attached to the windshield, but rested on the dashboard). Peter Wenger was in charge of the investigation. Wenger reported that Glebocki was hostile, angry and belligerent. Wenger believed that Glebocki made inconsistent and contradictory statements. Wenger notified Glebocki that the investigation was being expanded to cover the additional allegation that Glebocki made inconsistent statements.

Wenger concluded that Glebocki did drive his car without a vehicle sticker and that Glebocki gave false statements during an investigation. He recommended that Glebocki be separated from employment. Wenger never before recommended separation based on a city sticker violation; the usual penalty for such a violation was a one-day suspension. Of course, Wenger did not find only a city sticker violation, but the additional violation of giving a false statement. The recommendation was not adopted by the Department.

**The Shore Galleries Incident**

Fitzsimmons continued to dig up information on Glebocki. He asked other instructors about Glebocki and says he was told by Matthew Tobias that Glebocki had a verbal altercation with a gun dealer from Shore Galleries on "Gun Day" at the Academy in May, 1997. Fitzsimmons says that

4

he contacted Shore Galleries and spoke to the owner, Mitchell Shore. Fitzsimmons says Shore told him that Glebocki was rude, abusive, confrontational and threatening to him. Fitzsimmons requested an investigation of Glebocki's conduct and Wenger was assigned to the case. Wenger interviewed Shore and Cory Provenziano, another Shore Galleries employee. Wenger reported that the gun dealers said Glebocki was rude, shouted at them, and was threatening.

Glebocki says he was never rude or discourteous. He says he had a conversation with a Shore Galleries dealer at Gun Day. Glebocki's weapon had malfunctioned and was being repaired by Shore Galleries. The dealer was not returning Glebocki's calls, so when he saw the dealer at Gun Day, Glebocki had a conversation with him.

Wenger sustained the allegations of discourteous treatment to a member of the public and recommended a three-day suspension. It appears that this recommendation was also not adopted by the Department.

**The Citizens' Complaint**

After he graduated from the Academy, Glebocki worked the 13th District. A female civilian lodged a complaint against Glebocki alleging that on February 10, 1998, Glebocki acted rude and unprofessional toward her. She alleged that he stopped her in his private vehicle and "yelled like a madman saying 'are you fucking crazy, give me your fucking license, I'm the fucking police.'" The investigator found insufficient evidence of unprofessional behavior based on conflicting reports from the complainant and her passenger. The investigator did not sustain the allegations.

5

## Disciplinary Proceedings

Assistant Deputy Superintendent Charles Roberts recommended that Glebocki's progress and performance be reviewed by the Field Evaluation Review Board (FERB). The FERB reviews a probationary police officer's performance by reviewing disciplinary records, medical records, field performance and academic training. The Board then makes a recommendation to the Director of the Training Division.

The Board convened on March 12 and 13, 1998 to consider Glebocki's performance. Its unanimous recommendation was to terminate Glebocki's employment. The chairperson of the board stated that the basis of its recommendation was that Glebocki was untruthful and untrustworthy; he had a consistent pattern of deceit; he had a problem responding to situations without losing his temper; and he was resentful of authority. On March 16, 1998, Glebocki received a notice of termination based on the findings of the Board.

Glebocki denies he was unprofessional or rude; denies that he drove his car without a vehicle sticker; denies that he made false statements in the course of an investigation; and claims that his absences were not his fault. He had permission to go to the naturalization ceremony and it ran late; he tried to get his car repaired and be at the Academy on time, but it didn't work out. Fitzsimmons, according to Glebocki, targeted him because he was Polish and did everything in his power to get him off the force.

## Res Judicata

There is some procedural history to this case that defendant argues bars Glebocki's Title VII claim. Glebocki filed a complaint in state court alleging national origin discrimination in violation of the Illinois Human Rights Act, and alleging due process violations under the U.S. Constitution.

Defendant removed that case to this Court, and I dismissed the claims. Plaintiff then moved to amend the complaint in state court and was given leave to do so. On defendant's motion, however, the state court dismissed the case for lack of jurisdiction because there was no pending case against the defendants. In an alternative holding, the state court found that the amended complaint did not state a Title VII claim because it failed to allege exhaustion of administrative remedies. Glebocki then filed a new complaint in federal court, the case at bar.

Defendant says the state court dismissal counts as a decision on the merits and acts as *res judicata* to the claims here. As I read the state court's decision, its holding was based on jurisdiction. The court's comments concerning Glebocki's failure to state a claim were not necessary to its decision, therefore I decline to dismiss the claim.

**The Merits**

Defendant says there is no *prima facie* case of discrimination because Fitzsimmons was not the decisionmaker; even if his comment about importing stolen cars to Poland could be taken as animus based on national origin, it was not made by a decisionmaker and was not connected to the adverse employment action -- the termination months later. *See Wallace v. SMC Pneumatics*, 103 F.3d 1394, 1400 (7th Cir. 1997). However, as the court in *Wallace* noted, if the non-decisionmaker feeds false information to or conceals relevant information from the decisionmaker and influences the adverse employment decision, the discriminatory motive of the non-decisionmaker may be the real cause of the termination. *Id.*

Glebocki says that Fitzsimmons is anti-Polish. One could infer this animus based on the stray remark about the car thieves. The theory is that animus drove Fitzsimmons to bring charges against Glebocki for which he was innocent. In other words, Fitzsimmons gave false or misleading

7

information to the higher-ups in order to get Glebocki disciplined and did this because he doesn't like Poles. This might be enough to entitle Glebocki to a trial, but only if there is some evidence that the FERB acted because of Fitzsimmons's information or influence. In this case, given the bureaucracy and chain of command with respect to probationary police officers, Glebocki must show that Fitzsimmons's allegedly false or misleading charges were the reason for the termination.

According to the FERB performance review, several witnesses (Fitzsimmons aside) gave damning interviews concerning their personal contacts with Glebocki. Wenger, Christian, Sgt. Karen Rowan, and Sgt. Kenneth Kudulis all testified to their belief that Glebocki was deceitful and resentful of authority. Draper-Sidley previously sustained allegations against Glebocki (and investigated allegations against Fitzsimmons). In addition to Fitzsimmons, both Christian and Wenger recommended termination. There were other officers who testified that Glebocki had the makings of a fine officer, he was honest and respectful. There is no evidence that the Board did anything but come to a conclusion based on the record before it. The only suggestion of national origin animus comes from Fitzsimmons, but he had little, if any, connection to the final decision -- he was but one witness out of many. Glebocki devotes his brief to arguing about Fitzsimmons's dislike of Poles, but this is not evidence of Fitzsimmons's ability to influence the FERB. There is no evidence of any relationship between Fitzsimmons and FERB members, or of any national origin animus held by any FERB members. I cannot infer the final decision was an attempt to conceal the Chicago Police Department's dislike of Polish immigrants. In short, defendant has demonstrated that Fitzsimmons was not the decisionmaker, at most he was the instigator. This is not enough since other officers investigated the charges and reached their own conclusions about Glebocki. It is also clear the FERB believed that Glebocki was a bad officer without reference to his national origin.

8

Glebocki has presented no evidence to suggest that belief was a lie; he does not allege that Wenger, Christian, Rowan and Kudulis gave false testimony to the FERB.

A different theory is that Fitzsimmons was harassing Glebocki, creating a hostile work environment, because he was Polish. He made the comment about the stolen car ring; he asked Glebocki questions about his immigration status; an affidavit from another recruit says that Fitzsimmons directed ethnic jokes toward Glebocki. On one occasion, Fitzsimmons made Glebocki stay at his post until personally released. Fitzsimmons made life tough for Glebocki, but his conduct was not so severe and pervasive as to alter his conditions of employment as understood in the Title VII context. There were stray remarks, the initiation of proceedings and some tough discipline. However, most of Fitzsimmons's conduct was national-origin-neutral. The only specific references to ancestry were in the stolen car comment, the questions concerning immigration and the allegation of ethnic jokes.[1] Glebocki was not subjected to the kind of concentrated or insistent barrage of ethnic slurs, comments, or even innuendo that rises to the level of discriminatory harassment at the hands of Fitzsimmons. *See Filipovic v. K & R Express Systems, Inc.*, 176 F.3d 390, 398 (7th Cir. 1999).

---

[1] Fitzsimmons is the grandson of a Polish immigrant.

**Conclusion**

Glebocki has failed to raise an issue regarding an objectively hostile environment based on the relatively isolated conduct of Fitzsimmons. Glebocki has also failed to raise an issue with respect to his termination. There is no evidence that it was based on anything other than the FERB's decision that he was not a good police officer. Defendant's motion for summary judgment [38-1] is granted.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: *Dec. 28, 2000*